**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

|  |  |
|---|---|
| In re:<br><br>TWIN CITY BAPTIST TEMPLE, INC.<br><br>Debtor | Chapter 11<br>Case No. 12-42233-MSH |

**MEMORANDUM OF DECISION ON DEBTOR'S OBJECTION TO CLAIMS OF T.D. BANK, N.A.**

Twin City Baptist Temple, Inc., the debtor in possession in this chapter 11 case, has objected to proofs of claim filed by TD Bank, NA. The claims have been docketed as claims number 7 and 8 on the claims register maintained by the court. Claim 7, in the amount of $2,048,405.55, was filed as a claim fully secured by a first mortgage and assignment of rents on the Temple's real estate located at 194 Electric Avenue in Lunenberg, Massachusetts and includes post-petition interest, fees and costs pursuant to § 506(b) of the United States Bankruptcy Code (title 11 of the United States Code). Claim 8, in the amount of $215,998.59, was also filed as a fully secured claim, with post-petition interest, secured by a second mortgage on the Lunenberg property. The Temple's property consists of approximately 27.5 acres of land improved by three structures, a house of worship, a school and a gymnasium.

The Temple's objection to the claims is premised on its belief that the Lunenberg property is worth far less thaN the amount of claim 7 and thus both claim 7 and 8 should be disallowed as neither is fully secured and neither qualifies for the inclusion of post-petition interest, costs and fees under Bankruptcy Code § 506(b).

In its claims objection the Temple alleges that the Lunenberg property had a fair market

1

value on June 1, 2012, two weeks before the filing of the bankruptcy petition commencing this case, of $1,700,000. This would make TD's second mortgage note, the subject of claim 8, totally unsecured and its first mortgage note, reflected in claim 7, partially secured. TD, on the other hand, maintains that as of March 6, 2012, the property had a fair market value of $3,250,000, a value sufficient to render both its claims fully secured.

Before proceeding to the merits, it is necessary to digress to clear up a point of procedure. Neither the Bankruptcy Code nor the Federal Rules of Bankruptcy Procedure allocates the burden of proof for valuing a secured claim under § 506(a). As a result, courts have fallen into three camps: one that places the burden on the secured creditor, a second that places the burden on the party challenging the valuation and a third that employs the burden-shifting approach generally adopted for adjudicating claims objections. *See In re Heritage Highgate, Inc.*, 679 F.3d 132, 139-40 (3d Cir. 2012) (citing examples of each approach). Mindful that "[t]he circumstances will dictate the assignment of the burden of proof on the question of value," *In re Young,* 390 B.R. 480, 486 (Bankr. D. Me. 2008), I find the burden-shifting approach to be most suitable in this case and will employ it. That approach may be summarized as follows:

> A proof of claim filed pursuant to the Federal Rules of Bankruptcy Procedure represents prima facie evidence of the validity of the claim. Fed. R. Bank. P. 3001(f); *see also In re Long,* 353 B.R. 1, 13 (Bankr.D.Mass.2006). The party objecting to the claim must provide "substantial evidence" to refute the prima facie validity of the claim. *Id. citing United States v. Clifford (In re Clifford),* 255 B.R. 258, 262 (D.Mass.2000). If the objecting party successfully rebuts the prima facie validity of the claim, the burden then shifts back to the claimant to demonstrate that the claim is valid. *In re Long,* 353 B.R. at 13 *citing Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.),* 993 F.2d 915, 925 (1st Cir.1993). The claimant must so demonstrate by a preponderance of the evidence. *In re MacMillan,* 02–11808–JMD, 2003 WL 22454871 (Bankr.D.N.H. Oct. 20, 2003) *citing In re Colonial Bakery, Inc.,* 108 B.R. 13, 15 (Bankr.D.R.I.1989).

*In re QR Properties, LLC*, 485 B.R. 20, 24 (Bankr. D. Mass. 2013).

Returning to the matter at hand, I conducted an evidentiary hearing to determine the value of the Lunenberg property at which each party introduced into evidence an appraisal supporting its valuation and offered its appraiser as an expert witnesses for cross-examination. Joseph Flanagan of Howard E. Dono & Associates, Inc. prepared the Temple's appraisal and testified at the evidentiary hearing. Charles L. Clark of Grubb & Ellis Landauer Valuation Advisory Services, LLC did the same on behalf of TD. Both appraisers were thoroughly versed in the subject property and appeared knowledgeable and articulate about their methodologies. Both concluded that the comparable sales approach to value was the appropriate valuation methodology and that the highest and best use of the property was its current use as a house of worship or educational institution. Both appraisers identified functional obsolescence as a negative factor in valuing the property due to the large size of the house of worship building. The appraisers dramatically diverged, however, in their choices of comparable sales for purposes of arriving at a value for the Temple's property.

Because the highest and best use for the property is as a house of worship or school, TD's appraiser, Mr. Clark, limited his search to comparable sales where *both* seller and buyer engaged in this use. As a result he came up with seven comparable properties involving the sale and purchase of schools in Massachusetts located in the Jamaica Plain section of Boston, Granby, Leominster, Chicopee, Waltham, Chelmsford and Tyngsboro.

While concurring as to the highest and best use, the Temple's appraiser, Mr. Flanagan, took a different approach to identifying comparable sales, one that was less rigid as to the nature of the purchaser in order to identify properties in closer proximity to the Temple's property. He relied on comparable sales in Ashby, Marlborough, Leominister, Athol and Gardner, Massachusetts.

3

Lunenberg, the locus of the Temple's property, is in Northern Worcester County along the Route 2 corridor. None of the comparable sales chosen by TD's appraiser are located in this region except 365 Lindell Avenue, Leominster which happens to be the only comparable shared by both appraisers. The other sales relied on by TD's appraiser, especially those Jamaica Plain, Waltham, Chicopee and Granby are geographically quite remote from Lunenberg.

TD's appraiser testified that he had no choice but to expand his field of vision to the outer reaches of the state because he believed he was constrained to compare only sales involving schools as sellers and buyers. He testified that he adjusted the values of the comparable properties to take into account various factors, including remoteness, in order to bring the comparable properties into general alignment with the Lunenberg property. These adjustments, he testified, were based entirely on his subjective determination of what was reasonable.

The Temple's appraiser also used subjective adjustments to bring his five comparable properties into line with the Temple's property but because he did not subscribe to the working assumption of TD's appraiser that all comparable sales must involve sales by schools to schools, he was able to identify comparable properties in closer geographic proximity to Lunenberg. Further, unlike TD's appraiser, who testified and whose appraisal confirms, that his adjustments to comparable sales data were subjective, the Temple's appraiser, while conceding that most of his adjustments were "qualitative" rather than "quantitative," included in the Temple's appraisal an explanation in considerable detail as to how his adjustments were arrived at.

The decision of TD's appraiser to narrow his search for comparable sales transactions involving schools exclusively resulted in sales for the most part in locations not comparable to Lunenberg. There was no convincing evidence presented to support a finding that the appraiser's

4

restrictive approach was necessary or reasonable. While it is true that TD's appraiser made adjustments to the sales data to account for geographic remoteness, his adjustments were entirely subjective and no credible evidence was presented as to how he made his subjective choices.

The methodology employed by the Temple's appraiser was more reasonable. He broadened his search criteria to include sales not exclusively between schools, thus enabling him to find properties for the most part along the Route 2 corridor and in closer proximity to Lunenberg. This was a justifiable tradeoff. Furthermore, in his appraisal, the Temple's appraiser provided insight into how he arrived at his "qualitative" adjustments to his comparable sales data in valuing the Temple's property.

Another notable difference between the two appraisals is how they accounted for general market price fluctuations in adjusting their respective comparable sales data. The comparable sales used by TD's appraiser took place between 2008 and 2011. While those identified by the Temple's appraiser occurred between 2009 and 2012. The Temple's appraisal made note of the 2008 credit crisis and resulting collapse of the real estate market nationally and locally. It then observed that the financing environment had improved between 2009 and 2012 and that real estate values were rising. Based on those predicates, the Temple's appraiser assumed that the value of real estate was increasing at the rate of 5% per year between 2009 and 2012 and adjusted the "apples to apples" value of his comparable sales data accordingly. The TD appraisal is silent on this issue and fails to take account of any market price fluctuation between the sale dates of its comparable sales and the date of its appraisal, with the exception of a one-time 5% adjustment for the oldest sale in 2008. The failure of TD's appraiser to account for price fluctuations in adjusting his comparable sales data is significant.

5

On the basis of location of comparable sales selected by the appraisers, the reliability of adjustments applied to those comparable sales data and consideration of market price fluctuation, I find, as between the two appraisals, that the Temple's appraisal presents a more rational and more reliable approach to determining the value of the Temple's property. Therefore, I find that the Temple has presented sufficient evidence to rebut the prima facie validity of TD's proofs of claims and that TD has failed to carry its renewed burden to establish by a preponderance of the evidence that its valuation of the collateral securing its claims is correct. I conclude, therefore, that the value of the Temple's property as of the date of commencement of this bankruptcy case was $1,700,000. Based on this valuation I will sustain the Temple's objection to TD's claims 7 and 8 and afford TD the opportunity to amend its claims consistent with a $1,700,000 value of its collateral and the requirements of Bankruptcy Code § 506.

A separate order shall issue.

At Worcester, Massachusetts this 12th day of November, 2013.

By the Court,

_____
Melvin S. Hoffman
U.S. Bankruptcy Judge

Counsel Appearing:   James L. O'Connor, Esq.
                     Nickless, Phillips and O'Connor
                     Fitchburg, MA
                     for Twin City Baptist Temple, Inc.

                     Kevin P. Roy, Esq.
                     Wynn and Wynn
                     Raynham, MA
                     for T.D. Bank, N.A.